TUCHER, J.
*560 Defendant was convicted of 12 counts of lewd acts against a child, the daughter of his live-in girlfriend ( Pen. Code, § 288, subd. (b)(1) ),[1] and one count of continuous sexual abuse of the same child (§ 288.5, *561 subd. (a)). He contends the trial court abused its discretion in admitting the testimony of his former wife, who testified he raped her, and of her son, who testified defendant sexually abused him when he was a young child; that the trial court abused its discretion in precluding medical testimony by defendant's expert witness and admitting testimony by the prosecution's expert about child sexual abuse accommodation syndrome (CSAAS) and false allegations of child abuse; and that it committed instructional error. In the published portion of this opinion, we conclude the trial court abused its discretion in admitting the testimony of a prosecution expert on child abuse, Dr. Anthony Urquiza, that *258 studies show only a very small percentage of allegations of child sexual abuse are false. We also agree with defendant that the trial court erred in failing to instruct the jury that the section 228.5 count was an alternative to the 12 counts of specific lewd acts. In the unpublished portion of this opinion, we reject all but one of defendant's other contentions. However, we find the trial court's errors harmless and affirm the judgment.
I. BACKGROUND
A. Procedural History
Defendant was charged with 12 counts for forcible lewd acts on a child under the age of 14 ( § 288, subd. (b)(1) ; counts 1 through 12) based on acts alleged to have taken place at various times between August 24, 2010 and August 23, 2012, and one count of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a); count 13) during the same time period and with respect to the same child, with allegations that he used force, violence, duress, menace, or fear and that he had substantial sexual conduct with the victim in connection with all 13 counts (§ 1203.066, subds. (a)(1) & (a)(8)).
Defendant's first trial ended in a hung jury, and the trial court declared a mistrial. In the second trial, the jury found defendant guilty on all counts and found as to each count that he had substantial sexual contact with the victim, L.D.
At the sentencing hearing, the trial court sentenced defendant to the upper term of 10 years for counts 1 through 4 and the midterm of eight years for counts 5 through 12, with all sentences to run consecutively, for a total prison term of 104 years. The court dismissed count 13 as duplicative of the other counts.
B. Prior Sexual Offenses (Admitted Under Evid. Code, § 1108 )
1. Nicole C.
Defendant's former wife, Nicole C., testified that she first became sexually involved with defendant when she was 14 years old and he was 19 years old.
*562 She became pregnant with someone else's child while she was 14, and began dating defendant again when she was about 15 and her son J.D. was a baby. When J.D. was almost two years old, the three of them moved to Kansas. They spent six months with defendant's sister in Independence, then moved to the city of Cherryvale. Nicole was pregnant with defendant's child when they moved to Kansas, and gave birth to a son, B.W., in January 2004. Defendant and Nicole married when Nicole was 16 years old, before B.W. was born.
Defendant would often take care of the children while Nicole worked in the evenings, feeding and bathing them and getting them ready for bed.
When B.W. was a few months old, defendant began to be aggressive. On one occasion he kicked Nicole off the bed and continued kicking her when she refused to have intercourse with him. Another time, when she was trying to leave him, he pinned her against the wall, threw his wedding ring at her eye, and punched the wall next to her face. On three occasions, he raped her. The first rape took place in the bathroom, over the sink. She did not recall the events that led up to it. The second rape took place in the living room, while the children were present. She did not want to have intercourse with him and he got angry; Nicole testified, "I didn't want to fight it again because I was so scared of the last time." Nicole also testified that defendant raped her anally on one occasion, in their bedroom.
*259 About six months after the assaults began, Nicole decided to end her relationship with defendant, and he moved out of the house. Afterward, he wrote her a letter in which he told her he was sorry for raping her and an email that said, "I know I raped you and ... I am sorry." Nicole never reported the rapes to law enforcement.
Nicole left Kansas and returned to California when J.D. was "three, turning four." She had noticed that J.D. was frightened at night and that he was worried defendant would come and kidnap him and B.W.
2. Assaults on J.D.
J.D. was 15 years old when he testified in 2016. He testified that B.W. was born when he was two and a half or three years old, and that he returned from Kansas to California when he was about five or six years old. While they were living in Kansas, defendant watched J.D. when Nicole was working.
J.D. testified that the bathroom in the family's home in Kansas had a standing shower, and defendant bathed J.D. in the shower. Defendant would *563 get into the shower with J.D. J.D. testified that defendant raped him in the shower when he was four or five years old, by standing or squatting behind him and putting his penis in J.D.'s anus. It caused J.D. intense pain. This happened almost every time defendant showered with him. J.D. recalled a little bit of bleeding from his anal region and recalled having difficulty passing stools; he did not know if the problems were caused by the anal rapes or by his lactose intolerance. He sometimes had a hard time sitting as a result of the pain, and it was sometimes hard to sleep. Defendant told J.D. that if he told Nicole about it, J.D. would get into trouble, and defendant threatened to kill J.D., Nicole, and B.W.
After J.D. returned to California, he told a friend what had happened, but he asked her not to tell anyone. He did not tell Nicole until he was older. When J.D. was about nine years old, while he was temporarily living with grandparents in Washington State, he began seeing a therapist because he was getting increasingly angry and "didn't want to come out and do anything." He did not tell the therapist about the sexual abuse immediately; after the therapist continued asking him about what had happened in his past and what was aggravating him, J.D. found it overwhelming to "keep it in," and a week or two after he began therapy he revealed what had happened.
There were some inconsistencies with J.D.'s memories. He testified the shower in the Kansas house had a plastic door that pulled out and that once, when defendant was raping him in the shower, he hit the shower door so hard that he bent it, so that it came out of the seal at the bottom. In an interview that took place in 2011, when he was ten years old, he said he broke the door and ran away. The evidence showed, however, that the shower in the house in Cherryvale had a plastic shower curtain, not a door. About three feet away, a flimsy "pocket door," which rolled into the wall, led to J.D.'s bedroom.
In the 2011 interview, when he was ten years old, J.D. said that after the incident in which he broke the shower door, he ran to his room and locked it; he and B.W. climbed down from their second-floor window on a ladder outside; and J.D. rode his tricycle, with B.W. on his lap, to "where [his] mom was." At trial, however, he testified he did not recall those events, and Nicole testified he never visited her at work. J.D. testified that he recalled riding his bike with B.W. after one of the incidents in the shower, but did not recall going to Nicole's work.
*260 Nicole never noticed any injuries on J.D.'s private parts, except one occasion when a bug bit him and caused swelling. She never noticed any blood on J.D.'s underwear. J.D. was no longer using diapers, and she did not inspect his anal area.
*564 3. The Investigation of J.D.'s Allegations
A social worker in Washington State informed Deputy Nicol Dudley of the Napa County Sheriff's Department that J.D.'s therapist had reported the abuse. Defendant was living in Napa with his girlfriend, G.G., and her three daughters. He agreed to meet with Dudley. He told her he used to bathe J.D. in a shower and that he would get in the shower with J.D. when J.D. was younger. When Dudley told him J.D. said defendant had sexually assaulted him, defendant became angry, said, "That's crap," and walked out of the room.
G.G. testified that when she told defendant Dudley wanted to meet with him for this 2012 interview, he looked "frantic." When he came out of the interview, he was angry and told G.G. that L.D. was going to put him in prison.
At Dudley's request, G.G. brought her three daughters for an interview; they were ten, five, and two years old. The two-year-old was too young for Dudley to interview, and the five-year-old disclosed nothing of concern. Ten-year-old L.D. indicated that no one had touched her in a way she did not like, and she said nothing about defendant touching her inappropriately. Dudley did not ask specifically whether defendant had touched her. When asked whether there was anything she liked or disliked about defendant, L.D. did not disclose any abuse.
C. The Crimes Alleged Against Defendant-Abuse of L.D.
L.D. was 15 years old in 2016, when she testified at trial. She testified that defendant began living with the family when L.D. was in second grade, that L.D.'s youngest sister, N., was the daughter of defendant and G.G., and that L.D. was about nine years old when N. was born.
One day around the end of L.D.'s second grade year, she was watching television with her mother, younger sister S., and defendant. She did not know if N. had been born yet, but the event occurred before the family moved from a downstairs to an upstairs apartment when L.D. was in fourth grade. She was sitting on a couch with defendant, behind the others, who were on a mattress on the floor. Defendant took L.D.'s hand, put it in his lap, and put it down his pants against his genitals. L.D. did not tell her mother because she did not want her mother to break up with defendant and be sad again. On other occasions when the family was still in the downstairs apartment, defendant would look in a mirror in a bedroom that allowed him to watch L.D. in the shower. When she was ten years old, after they moved to the upstairs apartment, he would reach into the shower and try to touch her.
*565 L.D. slept on a bottom bunk; she sometimes woke up during the night and found defendant standing next to her pillow. He would sit on the bed, pull his pants down, and tell her to put her mouth on his genitals. Defendant would hold her nose until she had to open her mouth, put his hands in her mouth, and tell her to put his penis in her mouth. He would grab the back of her head and her hair and move her to where he needed her to be. He would instruct her on what to do with her mouth and tell her she was doing it wrong. He would also touch her on her chest and put his mouth on her chest. On other occasions he would touch her vagina with his penis or put his fingers in her vagina, thrusting forward with his arm and causing her pain. He would insult her while he was doing *261 this. On a few occasions, he ejaculated. He tried to put his penis in her vagina once or twice. The molestations occurred approximately weekly for years. L.D. thought they became more frequent as she grew older and entered puberty.
After the first molestation, L.D. told her mother that defendant had tried to kiss her, but otherwise she did not tell her mother what was happening.
L.D. was taken to speak with the sheriff's deputy in 2012, when she was 10 years old and in fifth grade. She heard her mother and grandmother talking about defendant doing bad things, and her mother was nervous. G.G. told L.D. she should answer the questions honestly and said she did not want defendant to go to jail.
L.D. testified that at that point, the things that defendant was doing seemed almost normal to her, "like, it was supposed to happen, like, it was my job to be there and do that for him," although she had begun to question whether they were wrong. She considered telling the sheriff's deputy what was happening, but dismissed the idea. She did not tell anyone what had happened after she was questioned by the deputy, either. She testified that she said nothing because it was embarrassing, she did not want to upset anyone, and she did not want to draw attention to herself.
The abuse continued after L.D. was questioned by the deputy sheriff. Defendant moved out in 2013. L.D. became depressed in middle school and began seeing a therapist. She disclosed the abuse to the therapist in 2015. Shortly afterward, she spoke with a police detective about the abuse. She was embarrassed and nervous during the conversation and she did not tell him the whole truth about what had happened. The detective asked if defendant had ever put his penis in her mouth or his fingers in her vagina, and she told him no.
D. Expert Testimony of Dr. Urquiza for Prosecution
The prosecution presented the expert testimony of Dr. Anthony Urquiza, a professor of pediatrics and director of a child abuse treatment program *566 at U.C. Davis Medical Center. Dr. Urquiza testified for the prosecution as an expert in child sexual abuse, suggestibility, false accusations, and the effects of abuse on children. He testified about traits or behavior sometimes exhibited by child victims of sexual abuse, known as CSAAS.
Dr. Urquiza explained that there were a number of myths about child sexual abuse. One of them is that a child who is sexually abused will immediately disclose the abuse. Others are that children who are being abused will show signs of distress, will stay away from the perpetrator, and can keep themselves safe from sexual abuse, and that most abuse is perpetrated by strangers. Dr. Urquiza testified that children may describe the basic facts of sexual abuse accurately, but as to other details their memory may be faulty or inconsistent. He also testified that some abusers target both boys and girls.
CSAAS has five elements: First, secrecy; that is, a child may keep the abuse secret because of the abuser's position of power, because of threats, because of a special relationship between abuser and child, or because of shame. Second, helplessness; that is, the child's inability to keep himself or herself safe. Third, entrapment and accommodation, an element that can include dissociation, or children shutting down their feelings when they think of the abuse, and failing to show emotion when discussing it. Fourth, delayed and unconvincing disclosure; as an example, the initial disclosure may be vague, with more details revealed over time. And fifth, *262 retraction or recantation of the allegation, which takes place in a minority of cases. Abused children may deny that the abuse is taking place when asked directly.
Dr. Urquiza explained that CSAAS is not a tool to determine whether a child has been abused, but is meant to explain to therapists the ways in which children respond to abuse when it occurs. He did not know the details of this case and offered no opinion on whether L.D. had been sexually abused.
Dr. Urquiza also offered testimony about false allegations of child sexual abuse, as discussed further below.
E. Defense Evidence
Defendant testified in his own defense and denied sexually abusing J.D. He said he was responsible for showering J.D. but that he never did anything inappropriate in the shower.
He denied having been violent with Nicole or raping her. He said that he and Nicole had had an agreement that if they had sexual intercourse before she went to work, he would not ejaculate inside her. On one occasion when *567 they had intercourse three hours before she had to go to work, he failed to withdraw before ejaculating, and she was upset because she had to shower again and change before work. She referred to the incident as a rape, and in an effort to appease her and save their marriage he used the same term in his letter to her after they separated.
He testified he never sexually abused L.D. L.D. sometimes took long showers, and he once opened the bathroom and told her she needed to get out; when she yelled at him to get out of there, he said he would reach in and turn the water off. He never opened the shower curtain. He testified that L.D. sometimes tried to sit on his lap or run and jump on him, and that he would shoo her away because his work as a tattoo artist caused him to be a germaphobe and he did not like physical contact. He also testified he did not tell G.G. that L.D. would "put him in prison."
Defendant testified that L.D. did not sleep on the bottom bunk.
F. Expert Testimony of Dr. Coleman for Defense
Dr. Lee Coleman, a psychiatrist, testified as an expert for the defense in the areas of childhood development, memory, suggestibility, and child sexual abuse investigations.
According to Dr. Coleman, people begin to form lasting memories at age three and a half or four, and it is difficult to determine whether these early memories fully reflect actual events or whether they are a combination of true events and matters that happen later or that the child hears from other people.
Dr. Coleman did not believe CSAAS was accurately described as a syndrome, which he described as a grouping of symptoms that suggests a particular diagnosis. Each of the elements of CSAAS is equally consistent with true and false accusations.
Dr. Coleman also discussed the frequency of false claims of child sexual abuse, as further discussed below.
II. DISCUSSION
A.-B.**
*568 C. Statistical Evidence
After Dr. Urquiza testified about CSAAS, the prosecutor said: "I want to step outside of the accommodation syndrome briefly and talk to you about something *263 we mentioned previously, false allegations."
Dr. Urquiza then testified that there was a limited amount of research on the topic of false allegations of child sexual abuse, but that false allegations occur "very infrequently or rarely," most often during a child custody dispute. He continued, "There are a number of studies that talk about the pressures put on children to make a false allegation. He referred to a "classic" Canadian study that found "about 4% of cases in which there was an allegation that was determined to be false," remarking that "[w]hat was notable [about the study] was that in none of those cases was it a child who made the allegation that was false, it was somebody else," such as a parent disputing custody.
On cross-examination, Dr. Urquiza testified that it was difficult to determine whether an allegation was false, but that the Canadian study was one of the best available. In the Canadian study, he believed, the determination that an allegation was false was made on a case-by-case basis after a follow-up investigation by the researchers who reviewed records from child protective services and law enforcement. Dr. Urquiza also testified there were 12 to 15 other studies on the subject, which found false allegations in between one and six percent of cases. Although the "classic" study found no children making false allegations of sexual abuse, he concluded that "it's better to say that false allegations do happen, because they do happen, but they happen very infrequently and rarely ..." He agreed it was possible for children to have false memories, but there was no data indicating false memories happened frequently. And, in his own career, Dr. Urquiza had come across two cases in which a child alleged sexual abuse that he believed did not occur.
Defendant contends this numerical evidence improperly amounted to testimony that 96 percent (or between 94 and 99 percent) of children accusing a person of child molestation were telling the truth, and that this invaded the province of the jury in assessing a complaining witness's credibility. No California case appears to have addressed this issue directly, but cases in other jurisdictions raise serious questions about the propriety of this type of evidence.
In United States v. Brooks (C.A.A.F. 2007) 64 M.J. 325 ( Brooks ), the defendant in a military court martial was charged with indecent liberties with a female under the age of 16. ( Id . at p. 326.) An expert witness testified that the research indicated that between five and 20 percent of such allegations were false, and that the general sense was that in divorce cases, where purely *569 fabricated allegations occurred most frequently, the frequency of fabricated accusations was two to five percent. ( Id. at p. 327.) The appellate court concluded this "human lie detector" testimony "invaded the province of the court members to determine the credibility of the victim," because in effect he testified that there was "better than a ninety-eight percent probability that the victim was telling the truth," which went "directly to the core issue of the victim's credibility and truthfulness." ( Id . at p. 329.) Its admission was therefore error, which the court found prejudicial. ( Id . at pp. 329-330.) Following Brooks , the court in United States v. Mullins (C.A.A.F. 2010) 69 M.J. 113, 116, concluded that "[a]n expert inference that there is a 1 in 200 chance the victim is lying undermines the duty of the panel members to determine guilt beyond a reasonable doubt."
The court in Brooks relied on Powell v. State (Del. 1987) 527 A.2d 276 ( Powell ), in which the Delaware Supreme Court found *264 erroneous the admission of an expert's testimony that "ninety-nine percent of the alleged victims involved in sexual abuse treatment programs in which she was also involved 'have told the truth.' " ( Id . at p. 278 ; Brooks , supra , 64 M.J. at p. 329.) The court in Powell reasoned that the testimony "deprived [the defendant] of his right to have his fate determined by a jury making the credibility determinations, so clearly crucial in these cases, without guidance from an expert, in stark mathematical terms, bolstering the credibility of the complainant and thereby impugning his credibility. ( Powell , at pp. 279-280 ; see Wheat v. State (Del. 1987) 527 A.2d 269, 274-275 [in providing "statistical evaluation of complainant's present veracity," expert "impermissibly invaded the credibility province of the jury in 'lie detector' fashion"].)
Similarly, in Wilson v. State (Tex.Ct.App. 2002) 90 S.W.3d 391, 393, an expert testified that the rate of false allegations of child sexual assault was between two and eight percent, and the majority of those were child custody cases. This testimony, concluded the appellate court, "went beyond whether the child complainant's behavior fell within a common pattern and addressed whether children who claimed to be sexually assaulted lie. [The] testimony did not aid, but supplanted, the jury in its decision on whether the child complainant's testimony was credible," and was error. ( Ibid . )
Courts in other jurisdictions have reached similar conclusions. (See, e.g., Snowden v. Singletary (11th Cir. 1998) 135 F.3d 732, 737-739 ( Snowden ) [improper to allow expert testimony to boost credibility of alleged child victim with evidence that of 1,000 children expert had interviewed-including this child-995 told the truth]; United States v. Magnan (10th Cir. 2018) --- Fed.Appx. ---- [2018 U.S. App. LEXIS 33353, *10-11] [expert's testimony that studies found only two to four percent of children lie about sexual abuse is impermissibly credibility-bolstering];
*570 State v. Lindsey (1986) 149 Ariz. 472, 720 P.2d 73, 75 [expert's testimony that most people in the field feel only a very small proportion of incest victims lie held inadmissible]; State v. Myers (Iowa 1986) 382 N.W.2d 91, 92, 97-98 [evidence that a sexual abuse investigation program concluded that perhaps one in 2,500 children who were interviewed did not tell the truth held inadmissible]; State v. Parkinson (Ct.App. 1996) 128 Idaho 29, 909 P.2d 647, 654 [evidence of national research estimating range of false allegations of sex abuse properly excluded as lacking foundation]; Aguirre v. State (Kan.App. 2016) 379 P.3d 1149 [expert testimony suggesting that 93 percent of children who recant allegations are lying when they do so inadmissible]; State v. W.B. (2011) 205 N.J. 588, 17 A.3d 187, 201-202 ["Statistical information quantifying the number or percentage of abuse victims who lie deprives the jury of its right and duty to decide the question of credibility of the victim based on evidence relating to the particular victim and the particular facts of the case"]; State v. Kinney (2000) 171 Vt. 239, 762 A.2d 833, 843-844 [error to admit expert testimony that false reporting occurred in only two percent of rape reports]; State v. Catsam (1987) 148 Vt. 366, 534 A.2d 184, 186-188 [expert opinion that PTSD sufferers do not make up stories of child sexual abuse improper because "tantamount to a direct comment that the complainant was telling the truth about the alleged sexual assault for which the defendant was charged"]; see also State v. MacRae (1996) 141 N.H. 106, 677 A.2d 698, 702 [testimony that between 70 and 80 percent of males treated for substance abuse had been sexually abused improperly provided statistical evidence victim probably had been abused]; cf.
*265 State v. Morales-Pedrosa (2016) 369 Wis.2d 75, 879 N.W.2d 772, 778-780 [distinguishing Brooks and Snowden on ground that generalized statement that 90 percent of children claiming to have been abused are telling the truth was "less obviously objectionable than testimony that '99.5%,' '98%,' or even '92-98%' are telling the truth"]; but see Alvarez-Madrigal v. State (Ind.Ct.App. 2017) 71 N.E.3d 887, 892-893 [rejecting claim that expert testimony that some statistics show less than two or three children out of a thousand made up claims constituted improper vouching].)
Thus, it appears that the clear weight of authority in our sister states, the federal courts, and the military courts finds such evidence inadmissible. We find the reasoning of these cases compelling. Dr. Urquiza's testimony had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although Dr. Urquiza's testimony on this point was not expressly directed to either L.D. or J.D., the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to "draw the ultimate inferences from the evidence." ( People v. Melton (1988) 44 Cal.3d 713, 744, 244 Cal.Rptr. 867, 750 P.2d 741 ; see *571 People v. Wells , 118 Cal.App.4th 179, 189, 12 Cal.Rptr.3d 762 (2004) ["Jurors are generally considered to be equipped to judge witness credibility without the need for expert testimony"]; People v. Sergill (1982) 138 Cal.App.3d 34, 39-40, 187 Cal.Rptr. 497 [veracity of those who report crimes to the police not a proper subject for expert testimony].)
Although we doubt that any study can accurately capture the prevalence of false accusations of child sexual abuse, our concern about this statistical evidence is more fundamental. Even assuming one could determine that only one to six percent of sexual abuse allegations are false, that fact would not be helpful to the jury because it tells the jury nothing about whether this particular allegation is false. Are L.D. and J.D. in the four percent or in the 96 percent? The jury must evaluate their testimony, together with all the other evidence, to decide this question, and it should do so without statistical evidence placing a thumb on the scale for guilt. (See People v. Collins (1968) 68 Cal.2d 319, 331, 66 Cal.Rptr. 497, 438 P.2d 33 [evidence of mathematical likelihood of any random couple possessing distinctive features of perpetrators of crime would not bear on defendants' guilt because of statistical likelihood other couples also share those features]; People v. Sergill , supra , 138 Cal.App.3d at p. 40, 187 Cal.Rptr. 497 [officers' opinions of child's truthfulness "did not have a reasonable tendency to prove or disprove [child's] credibility and were therefore not relevant"].) The statistical evidence was not relevant, and its admission was more prejudicial than probative. Admitting Dr. Urquiza's statistical evidence was an abuse of discretion.
We next consider whether the admission of the statistical evidence was prejudicial. Defendant argues he was deprived of his federal constitutional rights to trial by jury, to a fair trial, to the presumption of innocence, to conviction only upon proof beyond a reasonable doubt, to due process of law, and to present a defense. He therefore urges us to apply the Chapman standard of prejudice, under which we reverse unless the error is harmless beyond a reasonable doubt. ( Chapman v. Cal. (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.) In similar situations, however, our high court has applied instead the standard of *266 People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243, under which we reverse only if it is reasonably probable the defendant would have reached a more favorable result in the absence of the error. (See People v. Bledsoe , 36 Cal.3d 236, 251-252, 203 Cal.Rptr. 450, 681 P.2d 291 (1984) [applying Watson standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped]; Collins , supra , 68 Cal.2d at pp. 331-332, 66 Cal.Rptr. 497, 438 P.2d 33 [applying Watson standard where " 'trial by mathematics' distorted role of jury"]; see also People v. Prieto (2003) 30 Cal.4th 226, 247, 133 Cal.Rptr.2d 18, 66 P.3d 1123 ["The erroneous admission of expert testimony only warrants reversal *572 if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "].) We will apply the same standard here.
Under the Watson standard, we conclude there was no prejudice. Dr. Urquiza's testimony on the statistical evidence was brief. He acknowledged that it was difficult to determine whether an allegation was false and that he himself had come across two cases in which he believed a child he was treating was making a false allegation of sexual abuse.
Moreover, defendant was able to rebut the statistical evidence through his expert witness, Dr. Lee Coleman, who testified that the four percent number reflected only the cases in which there was positive proof a child's allegations were false, and that there was no way to know the actual ratio of true to false allegations. Dr. Coleman pointed out that there are many examples of false memories-including cases in which the memories of large numbers of children had been influenced by adults investigating alleged crimes or in which allegedly recovered memories of Satanic ritual abuse had been debunked-and that interviewers in child abuse investigations often use unreliable methods. Dr. Coleman also acknowledged that it is rare for children to make up false accusations of abuse purposefully, explaining that false accusations are more likely to be the result of outside influences. Although the prosecutor pointed out in her closing argument that no one was trying to get L.D. to lie, there was no custody battle, and even Dr. Coleman testified children rarely lie about sexual abuse, she did not mention the statistical evidence. And the jury was instructed that it was the sole judge of the facts and the credibility of witnesses.
Here, where both L.D. and J.D. testified extensively and the jurors could assess their credibility, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony, we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony.
D.-G.***
H. Dual Convictions
Defendant contends the trial court erred in failing to instruct the jury it could not convict him of both continual sexual abuse of L.D. ( § 288.5 ) and *573 the individual specific lewd and lascivious acts against her ( § 288, subd. (b) ). Section 288.5, subdivision (c) provides in relevant part that "[n]o other act of ... lewd and lascivious acts, as defined in Section 288, involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative." The information did not comply with this limitation: Defendant was *267 charged in count 13 with continuous sexual abuse of a child, L.D. ( § 288.5, subd. (a) ) between August 24, 2010 and August 23, 2012, and in counts 1 through 12 with lewd acts with L.D. ( § 288, subd. (b)(1) ) at various times during the same time period, and the counts were not charged in the alternative.[4]
The trial court rejected defendant's request to instruct the jury that it could not convict him of both continuous sexual abuse and the specific offenses, concluding that if the jury convicted defendant of both charges, the continuous sexual abuse count could be vacated. The jury convicted defendant of all charges. The trial court sentenced him for counts 1 through 12 and dismissed count 13. The Attorney General concedes that count 1 through 12 and count 13 should have been charged in the alternative and that dual convictions were improper.
Our high court has ruled that where a defendant is erroneously convicted of both continuous sexual abuse and individual sexual offenses against a child taking place during the same time period, "either the continuous abuse conviction or the convictions on the specific offenses must be vacated." ( People v. Johnson (2002) 28 Cal.4th 240, 245, 248, 121 Cal.Rptr.2d 197, 47 P.3d 1064 ( Johnson ); see People v. Torres (2002) 102 Cal.App.4th 1053, 1057, 126 Cal.Rptr.2d 92 ( Torres ).)
This rule was explored further in Torres . In violation of section 288.5, subdivision (c), the defendant was convicted of continuous sexual abuse and multiple felony sex offenses against the same victim. ( Torres , supra , 102 Cal.App.4th at pp. 1059-1060, 126 Cal.Rptr.2d 92.) Our colleagues in Division One of the First District Court of Appeal concluded that the appropriate remedy, "in deciding which convictions to vacate as the remedy for a violation of the proscription against multiple convictions set forth in section 288.5, subdivision (c) [was to] leave appellant standing convicted of the alternative offenses that are most commensurate with his culpability." ( Id . at p. 1059, 126 Cal.Rptr.2d 92.) The jury convicted Torres of ten separate felony sex offenses and one overlapping count of continuous sexual abuse. ( Id . at pp. 1059-1060, 126 Cal.Rptr.2d 92.) "Because of the number and severity of these specific offenses, appellant faced a greater maximum *574 aggregate penalty with respect to these than he did on the continuous sexual abuse offense," leading the court to conclude "the appropriate remedy [was] to reverse the conviction for violating section 288.5." ( Id . at p. 1060, 126 Cal.Rptr.2d 92.)
The trial court here adopted the remedy contemplated in Torres . Defendant argues that the court should instead have sentenced him only on the continuous sexual abuse count and dismissed the twelve lewd act convictions. He points out that in Johnson , our high court affirmed an appellate court decision that vacated the individual sexual offense convictions, rather than the single conviction for continuous sexual abuse; and he argues that the procedure the trial court followed unfairly allowed the prosecutor to avoid the risks entailed by charging in the alternative. In Johnson , however, the court was not presented with the question of whether a court could properly vacate the continuous sexual abuse conviction rather than the convictions for specific offenses. And Torres explains that in the case of dual convictions, the court should leave the defendant convicted of the offense most commensurate *268 with his culpability. ( Torres , supra , 102 Cal.App.4th at pp. 1059-1060, 126 Cal.Rptr.2d 92.) Here, the trial court considered defendant's request to be sentenced for the single continuous sexual abuse count rather than the 12 specific offenses and explained its reasons for choosing the high term for four of those counts, including the pattern of continuing offenses, the abuse of trust, the use of violence, and the fact that defendant continued abusing L.D. after the police confronted him about his earlier abuse of J.D
We emphasize that the trial court should have instructed the jury that it could not convict defendant both of continuous sexual abuse and the specific offenses, and we do not condone the procedure adopted here of planning in advance to vacate any dual convictions. However, the verdicts show that the jury in fact found that defendant committed all 12 specific lewd acts that were alleged. We see no likelihood that, if properly instructed, the jury would not have convicted defendant of counts 1 through 12. Nor can we fault the trial court's conclusion that the convictions of counts 1 through 12 were most commensurate with defendant's culpability. To vacate these convictions, based simply on the trial court's procedural mistake in failing to instruct that section 288.5 was an alternative to counts 1 through 12, would give defendant an unjustified windfall.
Defendant's reliance on People v. Jaramillo (1976) 16 Cal.3d 752, 129 Cal.Rptr. 306, 548 P.2d 706 ( Jaramillo ), does not persuade us otherwise. In Jaramillo , our high court concluded a defendant could not be convicted of both unlawful driving or taking of a motor vehicle ( Veh. Code, § 10851 ) and receiving stolen property (§ 496)-the same motor vehicle-because the unlawful driving or taking offense could encompass theft of the vehicle, and a person may not be convicted of both stealing and receiving the same property.
*575 ( Jaramillo, at p. 754, 129 Cal.Rptr. 306, 548 P.2d 706.) In light of the uncertainty as to whether the Vehicle Code section 10851 conviction represented defendant taking, or simply driving, another's vehicle, the court reversed the convictions and remanded to allow the People to retry one or both counts or, if the People did not do so, for the trial court to reinstate the Vehicle Code section 10851 conviction only. ( Jaramillo, at p. 760, 129 Cal.Rptr. 306, 548 P.2d 706.) Here, there is no confusion about the factual basis for defendant's convictions. We conclude Torres supplies the correct remedy for a violation of section 288.5, subdivision (c).
III. DISPOSITION
The judgment is affirmed.
WE CONCUR:
POLLAK, P. J.
BROWN, J.

All undesignated statutory references are to the Penal Code.

See footnote *, ante .

See footnote *, ante .

At the first trial, the prosecutor indicated she would amend the information orally to charge count 13 in the alternative to counts 1 through 12. Nevertheless, the jury was not presented with these counts as alternate charges in the second trial.