Filed 8/28/20  P. v. Humes CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C089264 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE004862) |
| v. | |
| JON EMERSON HUMES, | |
| Defendant and Appellant. | |

A jury found defendant Jon Emerson Humes guilty of four counts of committing lewd and lascivious acts on a child under the age of 14, two counts of committing a forcible lewd and lascivious act on a child under the age of 14, and one count of aggravated sexual assault of a child under the age of 14.  Defendant contends the trial court denied him a fair trial when it admitted expert testimony about the relative infrequency of false allegations in child sex abuse cases.  We will affirm the judgment.

1

# FACTUAL AND PROCEDURAL BACKGROUND

Defendant sexually abused the victim, his daughter, from the time she was three or four years old to the time she was 14 or 15 years old. The victim lived with her mother over this period and defendant would live with them intermittently. The family moved frequently because of the mother's schizophrenia and paranoia. When the victim was 14 or 15, she moved in with her grandmother. Defendant only lived with the victim for one day after she moved in with her grandmother. After living with her grandmother for some time, the victim entered inpatient psychiatric care on a 5150[1] hold and told her treating physician about defendant's sexual abuse. She then told Child Protective Services.

### The Victim's Testimony

At the time of trial, the victim was 17 years old. She testified that one evening when she was three or four years old, defendant had been drinking. The victim was in bed when defendant entered the bedroom and told her he would be sleeping with her that night. Once defendant was in bed with the victim, he touched her chest, first over her clothes and then under her clothes. He then touched her thighs and her genitals under her clothing with his hands. Defendant inserted his fingers into the victim's vagina. He then attempted to insert his penis into her vagina. Defendant inserted his penis into her anus. The victim recalled that later that night, defendant went with her to the bathroom and wiped her bottom with a wash cloth, and she saw a pinkish liquid in the toilet that she later believed was a mixture of blood and ejaculate. The victim did not tell her mother about the incident because defendant told her not to tell anyone.[2]

---

[1] Welfare and Institutions Code section 5150.

[2] Counts one through four of the amended information arose out of this incident. Count one alleged a lewd or lascivious act involving contact between defendant's fingers and the victim's genitalia. (Pen. Code, § 288, subd. (a); undesignated statutory references are

2

The victim testified that in a separate incident when she was three or four years old, defendant put his hand on her hand and touched her vagina. In her testimony, she characterized defendant's actions as trying to teach her to masturbate. The victim did not remember this incident when she was first asked about it, but later remembered it, saying that it was "less significant" to her "than other memories." The parties later stipulated that defendant had previously made a call from county jail to his sister. In the call, defendant claimed that he did not molest the victim, but he did "show her how to masturbate" when she was four years old.[3]

Later, when the victim was six years old, she was lying on a bed alone in the fetal position. Defendant was in the room and talked with the victim for five or six minutes and lied down on the bed against her back. Defendant touched the victim's chest, stomach, and vaginal area, at first over her clothing, then under her clothing. He also inserted his fingers into the victim's vagina.[4]

When the victim was eight years old, she was playing by herself and pretending to be a cat. Defendant joined her and pretended he was a cat owner. He told her that cats did not wear clothes and that she should take her clothes off. She removed her clothes,

---

to the Penal Code.) Count two alleged a lewd and lascivious act involving contact between defendant's penis and the victim's genitalia. (§ 288, subd. (b)(1).) Count three alleged aggravated sexual assault (sodomy) of a child. (§ 269, subd. (a)(3).) Count four alleged a lewd and lascivious act involving contact between defendant's penis and the victim's anus. (§ 288, subd. (b)(1).)

[3] Count five of the amended information, which alleges defendant "put his hand on [the victim's] hand and put it on her genitalia," arose out of this incident. (§ 288, subd. (a).)

[4] Count six of the amended information, which alleges defendant committed a lewd and lascivious act involving contact between defendant's fingers and the victim's genitalia, arose out of this incident. (§ 288, subd. (a).)

and defendant watched her "intensely" as she continued to play. She remembered that defendant then touched the outside and inside of her thighs, but did not touch her vagina.[5]

The victim testified that when she was 11 or 12 years old, she was cooking something on the stove. She was wearing a long t-shirt that came down to mid-thigh level and was not wearing any underwear. Defendant came up behind her, lifted the back of her shirt, and slapped her buttocks with his hand. She did not recall defendant ever spanking her to discipline her at that age.

In a separate incident, the victim recalled waking up in the middle of the night with defendant standing over her and a phone in his hand. Although she had gone to sleep that night wearing clothes, when she awoke her pants were unbuttoned, unzipped, and had been pulled down, along with her underwear. She heard a click from the phone and saw a light flash, and noticed the phone was aimed below her stomach.

The victim also recalled an incident where defendant was giving her a massage and would touch the side of her breasts and buttocks. He also bought her two pairs of underwear—one pair was see-through and the other was a g-string—and told her he wanted to "see how they looked." He bought her two vibrators and told her he was reading an article about a stepdaughter who wanted to sleep with her father, which involved the father walking in on the stepdaughter while she was masturbating. He also offered her alcohol, marijuana, and methamphetamine, telling her "alcohol generally makes women act looser."

Defendant would also send the victim inappropriate images on her Facebook account, including pictures of naked children or teenagers. He sent her a picture of an

---

[5] Count seven of the amended information, which alleges defendant committed a lewd and lascivious act involving rubbing the victim's thighs "after telling her to take her clothes off and be a cat," arose out of this incident. (§ 288, subd. (a).)

4

erect penis, which she believed to be defendant's, based on the clothes and the background of the picture.

The victim stated that she told her mother multiple times about defendant's conduct, but that nothing changed. Her mother also told her not to tell Child Protective Services because foster care "would be a worse situation" than her current living conditions. The victim conceded that she had denied any sexual abuse when speaking with Child Protective Services until she was 15 years old.

### M.D.'s Testimony

Defendant was 29 years old when he met M.D., a 13-year-old girl. At the time of trial, M.D. was 34 years old. When she was 13 years old, she signed up for a voicemail dating service, stating that she was 18 years old. M.D. received a message from defendant and spoke with him several times on the phone. In the conversations, M.D. told defendant that she was only 13 years old, but he told her "it wasn't a problem and that he liked younger girls." Defendant told M.D. he was 21 years old. Defendant and M.D. made plans to go to the mall. Defendant picked her up, but drove in a direction away from the mall. As they were driving, he started touching her breasts and thighs under her clothing. Defendant then pulled off the road and M.D. performed oral sex on him. Defendant forced M.D.'s head lower onto his penis, then told her to remove her pants. He told her to recline her seat, pulled down his own pants, and inserted his penis into M.D.'s vagina. Defendant ejaculated in M.D., drove to a gas station for cigarettes, and drove her home.

After the encounter, M.D. told people at a group home where she had previously lived about the encounter and went to a hospital for a rape examination. Police enlisted M.D.'s father to make a recorded pretextual call to defendant. In the call, which was played for the jury, defendant admitted he knew M.D. was 13 years old, but that he had not forced her to do anything. Defendant stated that "if we did - if we had, uh, sex it was totally consens [*sic*] - in fact, uh, it really - she was the aggressor, you know?"

5

The parties stipulated defendant was convicted of unlawful sexual intercourse with a minor (§ 261.5) in 1999 for his conduct with M.D.

### G.S.'s Testimony

In 2004, G.S., an adult male, subscribed to a voicemail dating service. Defendant left multiple messages for G.S. The messages asked about G.S.'s children, and G.S. understood the questions to imply a sexual context. Defendant told G.S. that he had a three-year-old girl that he wanted G.S. to meet. Defendant stated that his daughter was "soft" and G.S. could "touch her." Defendant told G.S. that G.S. could have sex with defendant's daughter, and that defendant had touched her. Defendant told G.S. that defendant "had a shaved ass like a 12-year-old boy." Defendant said he wanted to meet G.S. before introducing G.S. to his daughter, saying "[w]e need to get this done now because my wife is about to come home, and I don't want her to interrupt us." Defendant instructed G.S. to "shave his dick" before they met.

While G.S. was speaking with defendant, G.S. drove to a pay phone and called 911. The police instructed G.S. to meet defendant at a car wash and contact a nearby police officer by phone after he had made contact. Once they met at the car wash, a police officer arrested defendant, who told the officer that he "might have had some child porn on his computer." A police detective conducted a search of defendant's apartment and found nude pictures of four different girls between the ages of nine and 13 years old. While the detective was searching the apartment, the victim, who was then three years old, and her mother came home to the apartment.

The parties stipulated defendant was convicted of annoying or molesting a child (§ 647.6, subd. (a)) and possession of child pornography (§ 311.11, subd. (a)) as a result of this incident.

### Sergeant Shane Spence's Testimony

At trial, Sergeant Shane Spence of the Sacramento County Sheriff's Department testified about a search warrant he executed on defendant's Facebook account in 2017.

6

Sergeant Spence found defendant had sent Facebook messages to his daughter's (the victim's) boyfriend in 2015, including one with a link to a Google search for "nufdist [*sic*] little girl vagina." Defendant sent a message after the link saying, "Excuse me, that ain't no little girl. 35 if she's a day. Good lord[!]"

Sergeant Spence also found several messages defendant had sent to a Facebook friend, B.H. The first message was a picture of a nude prepubescent female with other young females in the background. The second message was a picture of a young girl crying, with accompanying text saying "Just lie back and enjoy. It won't hurt. I promise. You'll love it." This picture was then sent a second time, with text saying, "Is it my fault males get high and . . . wanna suck the goo out of all the peepees, sheesh. Come to CA . . . Me and Julie are over, and I got the best Kristina friends. Come and let me finish deep in you. You will get HIV dating in Vegas. Come and heal [*sic*] me run a family nudism escort in our apartment . . . Shh, our secret." The third message was a screenshot of a video showing an infant girl getting her diaper changed and showing her vaginal area. The message was accompanied by text saying, "SLLLURP[!]" The fourth message was a picture of a nude prepubescent girl on a beach, and a text message saying, "Let's get baked and play babysitter takes a nap as the wolf pleases the chickeletxs [*sic*]."

### *Dr. Anna Washington's Testimony*

Dr. Anna Washington, a psychologist, testified as an expert about child sexual abuse accommodation syndrome (CSAAS) and the effects of sexual abuse on children. CSAAS is an educational tool to explain why children who have been sexually abused react to abuse in particular ways and "to help dispel some common myths regarding child sexual abuse." CSAAS is not meant to diagnose child sexual abuse.

Dr. Washington testified about the concepts of secrecy and grooming in child sexual abuse, or the idea that abusers cultivate a positive relationship with their victims before gradually introducing elements of sexual abuse into the relationship. Most abuse

occurs in the context of preexisting or positive relationships, and it is common for victims to rely on the abuser for love or affection.

Children may feel entrapped in the situation or helpless to prevent the abuse and react by keeping the abuse secret. Because of these feelings, children may also attempt to accommodate the relationship using disassociation, avoidance, shame, substance abuse, depression, anxiety, or self-harm. They may demonstrate sexual behavior problems or age-inappropriate sexual activity. These behaviors may occur while the abuse is ongoing, at the time the abuse is disclosed, or even after the abuse has stopped.

Because of the close relationships between children and their abusers, delayed or incremental disclosure of child sexual abuse is common. Delayed disclosure describes the phenomena that the majority of children do not immediately report sexual abuse at the time it occurs. Incremental disclosure means that children disclose only small pieces of their abuse at a time, rather than explaining everything that happened all at once. Victims may be vague and unclear when disclosing the abuse. They may share salient details, but forget context such as dates, times, and the sequence of events. This occurs because such abuse is overwhelming to children and may happen over a long period of time. It can also be the result of the conflicted feelings the child has for the abuser. Such delays, however, do not necessarily impact the accuracy of the disclosures.

On cross-examination, Dr. Washington acknowledged that she did not know anything about the facts or parties in this particular case and was only giving general information that could apply to child sexual abuse victims. Moreover, she could not "provide an opinion that any particular child was abused or not abused." She also noted that child sexual abuse accommodation syndrome would not apply to false allegations of child sexual abuse. She explained that "child sexual abuse" was not a specific diagnosis, but a legal term "that would be determined by the jury."

After questioning Dr. Washington about academic articles discussing child sexual abuse, defense counsel had the following exchange with Dr. Washington:

8

"Q.  And would you agree also that the rate for false allegations tends to be higher when there is a child custody dispute or some issue with the child in the range of 30 to 40 percent, are you aware of that?

"A.  So false allegations of child sexual abuse are exceedingly rare in general. There are some different studies, and depending on the methods that they have used, they find a different range of those studies.  Typically, I would give a ballpark number more so of four percent, slightly higher in child custody cases, maybe up to 12 percent.  The 30 percent sounds like it is a little bit of an outlier and not consistent with the majority of the research in that area.

"Q.  I apologize.  Have you reviewed those articles that talk about the higher rate of false allegations in child custody cases, have you read those articles?

"A.  I have read some articles in that area, yes.  And I think something that could be important to add on to there is that there has been some subanalysis there of who is making those reports, and we know that those false allegations tend to be made by someone other than the child."

On redirect examination, Dr. Washington explained that false memories of sexual abuse were typically the "result of some inappropriate type of forensic interviewing with a vulnerable child that sometimes occurred in the past" and that such a situation would be "unlikely to occur in today's -- with today's standards."

### Closing Arguments

Defendant did not testify and did not call any witnesses for the defense case-in-chief.  In closing arguments, the prosecutor emphasized the victim's credibility.  The closing argument also discussed Dr. Washington's testimony, arguing that her testimony explained the victim's delayed and intermittent disclosure of the abuse.  The prosecutor also highlighted evidence corroborating the victim's testimony, including the pornographic images found on defendant's Facebook profile, defendant's attempt to offer the victim up on a dating service to G.S., and defendant's jail call admitting one of the

9

incidents the victim recalled. The prosecutor did not cite Dr. Washington's testimony about the rate of false allegations in child sexual abuse cases.

Defense counsel questioned the credibility of the prosecution witnesses in his closing argument. In particular, he questioned the victim's credibility because of her delayed disclosures and other behavioral problems, including lies she had told to a foster parent about doing her homework and drinking alcohol. Defense counsel emphasized the facts that Dr. Washington's testimony should not be used as a diagnostic tool to assess whether any given person had been abused and, in any case, CSAAS does not apply in cases involving false allegations. Moreover, Dr. Washington did not have any specific knowledge "about this case, not the facts, not the witnesses, nothing."

The prosecutor briefly mentioned Dr. Washington's testimony in her rebuttal, saying that "the arguments and myths regarding child sexual assault" were the reason Dr. Washington's testimony was needed, and why the court would read a specific jury instruction about the expert testimony to use in evaluating the victim's credibility.

### *Jury Instructions*

The trial court instructed the jury with CALCRIM No. 226, which instructed the jury, in relevant part: "You alone, must judge the credibility or believability of the witnesses." The court also read CALCRIM No. 1193, which read, in relevant part: "Dr. Washington's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [the victim's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The jury deliberated for approximately two hours across two days before finding defendant guilty of all charged counts.

## DISCUSSION

Defendant contends Dr. Washington's testimony that only four to 12 percent of child sexual abuse allegations are false denied him a fair trial because it essentially

10

instructed the jury that there was a 96 percent chance the victim was telling the truth about defendant's conduct. In support of his argument, defendant relies on two recent cases—*People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*) and *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*)—both of which concluded that statistical evidence about false allegations of child sexual abuse is inadmissible evidence. (*Wilson*, at pp. 569-571; *Julian*, at p. 886.) Both cases were decided after defendant's trial.

The People argue defendant forfeited his claim because defense counsel did not object or move to strike Dr. Washington's testimony at trial. Anticipating this argument, defendant asserts he received ineffective assistance of counsel. Assuming without deciding the argument was not forfeited, we conclude any error was harmless.

Expert testimony about the probability of a false accusation in a child sexual abuse case is generally inadmissible. (*Julian, supra*, 34 Cal.App.5th at p. 887; *Wilson, supra*, 33 Cal.App.5th at p. 571.) In *Wilson*, the expert witness "testified that there was a limited amount of research on the topic of false allegations of child sexual abuse, but that false allegations occur 'very infrequently or rarely,' most often during a child custody dispute. He continued, 'There are a number of studies that talk about the pressures put on children to make a false allegation.' He referred to a 'classic' Canadian study that found 'about 4% of cases in which there was an allegation that was determined to be false,' remarking that '[w]hat was notable [about the study] was that in none of those cases was it a child who made the allegation that was false, it was somebody else,' such as a parent disputing custody." (*Wilson*, at p. 568.) On cross-examination, the expert also noted that the 12 to 15 other studies on the subject showed false allegations in a range of 1 to 6 percent of cases. (*Ibid.*)

The Court of Appeal concluded the admission of the testimony was an abuse of discretion, but not prejudicial using the *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) standard. (*Wilson, supra*, 33 Cal.App.5th at pp. 571-572.) In particular, the *Wilson* court cited the brevity of the improper expert testimony and the acknowledgement by the

11

expert it was difficult to determine whether an allegation was false. (*Id.* at p. 572.) The Court of Appeal also noted expert evidence submitted by the defense to rebut the improper expert testimony. (*Ibid.*) The defense expert noted there were many specific examples of false memories where children were influenced by adults investigating the alleged crimes or through interviewers using unreliable methods, and that "false accusations are more likely to be the result of outside influences." (*Ibid.*) The prosecutor did not mention the statistical evidence in closing argument and "the jury was instructed that it was the sole judge of the facts and the credibility of witnesses." (*Ibid.*) Thus, where the two victims "testified extensively and the jurors could assess their credibility, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony," the Court of Appeal saw "no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony." (*Ibid.*)

In *Julian*, the expert witness offered similar testimony regarding statistical data on false allegations, presented a similar percentage range of false allegations, and highlighted the fact that children were not the source of false allegations. (*Julian, supra*, 34 Cal.App.5th at pp. 883-884.)

Assessing whether defense counsel had offered ineffective assistance of counsel, the Court of Appeal noted that the trial in *Julian* "was a heavily contested case with strong defense evidence." (*Julian, supra*, 34 Cal.App.5th at p. 888.) The defendant cooperated with police and testified credibly at trial. (*Ibid.*) A nanny testified that she saw the defendant interact with the victim and her sisters and never saw the defendant act inappropriately. (*Ibid.*) Police did not find any evidence that the defendant possessed child pornography and the defendant did not make any incriminating phone calls from jail. (*Ibid.*) The victim's young sisters also testified that they did not see any inappropriate behavior from the defendant and thought that the victim "was lying." (*Ibid.*) "[I]n closing argument, the prosecutor asked the jury to rely on [the expert's] statistical evidence that 'children rarely falsify allegations of sexual abuse.' He reminded

jurors that [the expert] 'quoted a Canadian study for over 700 cases, *not a single one where there was a false allegation*.' " (*Id.* at p. 889.) The Court of Appeal concluded the admission of the expert testimony was prejudicial under any standard of harmless error and reversed. (*Id.* at p. 890.)

We agree with *Wilson* that *Watson* provides the most appropriate standard for assessing harmless error in this instance. (*Wilson, supra*, 33 Cal.App.5th at p. 571 ["In similar situations, however, our high court has applied instead the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, under which we reverse only if it is reasonably probable the defendant would have reached a more favorable result in the absence of the error"].) "The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247.) Our Supreme Court has previously concluded, for example, that the admission of expert testimony from a rape trauma syndrome expert for the purpose of proving a rape actually occurred is analyzed using the *Watson* standard. (*People v. Bledsoe* (1984) 36 Cal.3d 236, 251-252.) Similarly, the *Watson* standard applies to improper admission of evidence regarding the mathematical probability of the defendant's guilt. (*People v. Collins* (1968) 68 Cal.2d 319, 320, 332.)

As in *Wilson*, the error here is harmless. The improper expert testimony took comparatively little time in the context of the entire trial; the objectionable portion of Dr. Washington's testimony comprises less than one page out of more than 800 pages of trial transcript. Defense counsel and the prosecutor elicited other testimony from Dr. Washington mitigating the impact of the improper testimony, including her statements that she could not determine whether any given child had been abused or not abused, and that any such determination "would be determined by the jury." She presented alternative theories to account for false allegations without implicating the victim as a liar, such as improper influence by outside forces or complaints by third parties. Just as

13

in *Wilson*, the prosecutor here did not use any of the improper testimony in her closing argument.  Rather, she directed the jury to the jury instructions advising the jurors how to use Dr. Washington's testimony to make their own determinations about the victim's believability.  The victim also testified at length across three separate days, allowing the jury an adequate opportunity to assess her credibility.

Finally, unlike in *Julian*, there was significant evidence corroborating the victim's testimony such that Dr. Washington's testimony did not tip the scales against defendant.  Witnesses unrelated to the victim, including M.D. and G.S., testified to defendant's sexual offense conduct, including an apparent attempt to offer the three-year-old victim to G.S. for sex.  Police found child pornography in defendant's possession, both at the time of his encounter with G.S. and after his arrest in this case.  And, in a jail phone call, defendant admitted one of the incidents the victim described.  Based on the weight of the evidence, we conclude it is not reasonably probable defendant would have received a more favorable result absent the error.  (*Watson, supra*, 46 Cal.2d at p. 836.)

**DISPOSITION**

The judgment is affirmed.


_____/s/_____
RAYE, P. J.


We concur:


_____/s/_____
BLEASE, J.


_____/s/_____
MURRAY, J.


14