Filed 3/2/23 (unmodified opn. attached)

## CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL WILLIAM SEDANO,<br><br>    Defendant and Appellant. | F082933<br><br>(Super. Ct. No. F19902007)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the partially published opinion filed herein on February 21, 2023, be modified in the following particulars:

1. On page 12, in the third full sentence of the first paragraph, the words "borders on the frivolous" are deleted and replaced with "is utterly unconvincing" so the sentence now reads:

   Further, defendant's argument that this testimony constituted "affirmative profile evidence" is utterly unconvincing.

   There is no change in the judgment.

Appellant's petition for rehearing is denied.

DETJEN, J.

WE CONCUR:

POOCHIGIAN, Acting P. J.

SNAUFFER, J.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL WILLIAM SEDANO,<br><br>    Defendant and Appellant. | F082933<br><br>(Super. Ct. No. F19902007)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Robert L.S. Angres for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I. and III. of the Discussion.

Following a jury trial, defendant Daniel William Sedano was convicted of several sex offenses against Jane Doe, his adoptive niece: oral copulation or sexual penetration of a child 10 years old or younger (count 2), sexual intercourse or sodomy with a child 10 years old or younger (count 3), and forcible rape (count 4). He argues that (1) the conviction on count 2 must be reversed as violating the prohibition on ex post facto laws, an argument which the People concede; (2) the trial court erred in admitting expert testimony on child sexual abuse accommodation syndrome (CSAAS) statistics, or, in the alternative, that he received ineffective assistance due to his trial counsel's failure to object to the statistics testimony; and (3) his aggregate indeterminate sentences on counts 2 and 3 are unconstitutionally excessive. In the published portion of this opinion, we hold the admission of the expert's testimony regarding CSAAS statistics was not error. In the unpublished portion, we reverse the conviction on count 2, remand for possible retrial on that count, but do not otherwise reach the constitutional challenge.

## PROCEDURAL SUMMARY

By information filed on June 19, 2019, the District Attorney of the County of Fresno charged defendant with continuous sexual abuse of a child under age 14 (Pen. Code, § 288.5, subd. (a)[1]; count 1), oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b); count 2), sexual intercourse or sodomy with a child 10 years old or younger (§ 288.7, subd. (a); count 3), and forcible rape (§ 261, subd. (a)(2); count 4).

Following a trial, on October 27, 2020, the jury acquitted defendant on count 1 (continuous sexual abuse) and convicted him on the three remaining charges.[2] On

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The jury was instructed that count 1 was charged as an alternative offense to counts 2 and 3 and therefore defendant could not be found guilty of count 1 if he was found guilty on counts 2 and 3. The prosecutor urged the jury to acquit on count 1 and convict on counts 2, 3, and 4, which it ultimately did.

2.

June 11, 2021, the trial court sentenced defendant to an aggregate term of 46 years to life in prison, comprising consecutive terms of six years on count 4, 15 years to life on count 2, and 25 years to life on count 3. On June 15, 2021, defendant filed a notice of appeal.

**FACTUAL SUMMARY**

Jane Doe was born in May 1999 and was adopted when she was four years old.[3] Defendant is Doe's uncle, the brother of her adoptive father, and has known her since her adoption. Doe, who was 21 years old at the time of trial, testified that defendant (37 years her senior) had engaged in numerous sexual activities with her from age five to age 18. The conduct ranged from taking pictures of Doe blindfolded in bed at age five to repeatedly having sex with her when she was between the ages of 10 and 17. When Doe was 18, defendant also raped her at a hotel while they were on an overnight trip together.

The full details of the abuse are not germane to the issues on appeal. What is significant for purposes of this appeal is that Doe continued to spend time with defendant, even time she knew would be spent alone with him, throughout this period of abuse; and she never told anyone of the sexual misconduct until she was 18 or 19 years old, after the hotel rape. For instance, even when defendant's son Matthew (two years Doe's senior) walked in on Doe and defendant in bed at one point when Doe was either age six or 12, Doe did not disclose the sexual misconduct to him. Instead, at defendant's instruction, she later told Matthew that she and defendant were just "wrestling." In October 2018, when she was 19 years old, Doe reported the abuse to the police, and their subsequent investigation led to this prosecution.

At trial, David Love testified for the prosecution as an expert in the field of CSAAS. As he told the jury, he did not know any facts about the case and had never met

---

[3] At trial, to protect her identity, Doe was identified by her first name only. In this opinion, we take the more protective measure of referring to her by the pseudonym "Jane Doe." (See § 293.5, subd. (a).)

any of the participants; he was only there to explain the body of research on CSAAS. Love explained that CSAAS derives from a clinical study of 2,000 children who were sexually molested and describes the most typical symptoms that these children exhibited. According to Love, CSAAS has five groups of symptoms or behaviors: secrecy; helplessness; entrapment and accommodation; delayed, conflicted, and/or unconvincing disclosure; and retraction. He testified that CSAAS "is not a clinical diagnostic tool," nor is it a diagnosis of child abuse; it is "a description of a group of behaviors."

Love then went into detail about each of the five categories of behavior. His testimony regarding two of the categories included certain statistics that form the basis of defendant's evidentiary challenge in this appeal. In describing the second category of behavior—helplessness—Love informed the jury that another expert's study of over 250 children who had been molested "found that 94 percent of these kids in his study had a pre-existing relationship with the molester." Love testified that, contrary to the "stranger danger" myth, abusers are "[n]inety-four percent brothers, uncles, moms, dads, sisters, priests, rabbi, Boy Scout leader, teachers, people who have a relationship with this child."

Then, in describing the fourth category—delayed, conflicted, and/or unconvincing disclosures—Love acknowledged the societal assumption that "if it was true," meaning if someone had been sexually abused as a child, "they would have come forward a long time ago"; and the perception that, because they did not, there must be some ulterior motive for the allegations of abuse. Love then testified that the research showed, in actuality, "[d]elay in and of itself isn't an exclusionary or damning kind of thing" when it comes to disclosure of childhood sexual abuse. Rather, as shown by another expert's study, 74 percent of sexually abused children had not disclosed one year after the molestation, and 50 percent had not disclosed five years later; and Love's own research showed a "whole group" that averaged 10 to 15 years before disclosing. From this data, Love opined that "actually it was more common to delay than not," and that "delay seems to be more part of the ingredient than the exception to the rule."

Defense counsel did not object to any portion of Love's testimony, though she had previously moved to exclude all CSAAS testimony. The trial court deferred ruling on that motion in limine and ultimately denied it after Doe's testimony, finding the CSAAS evidence probative in part because of the cross-examination regarding her lack of disclosure after the Matthew walk-in incident.

## DISCUSSION

### I. EX POST FACTO VIOLATION[*]

Defendant first argues that his conviction on count 2 for oral copulation or sexual penetration with a child 10 years old or younger, imposed pursuant to section 288.7, subdivision (a), violates the ex post facto clauses of the United States and California Constitutions because the evidence and instructions permitted the jury to convict defendant based on conduct preceding the effective date of section 288.7. We accept the People's concession that reversal is required for this count.

"Any law that applies to events occurring before its enactment and which disadvantages the offender either by altering the definition of criminal conduct or increasing the punishment for the crime is prohibited as ex post facto." (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1306 (*Rojas*); see U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.) Section 288.7 became effective on September 20, 2006, and "created a new offense which imposes an indeterminate life sentence for sexual intercourse, sodomy, oral copulation, or sexual penetration of a child who is 10 years of age or younger." (*Rojas*, at p. 1306; Stats. 2006, ch. 337, § 9.)

For count 2, the prosecution presented evidence of two separate incidents that could constitute the charged offense: (1) an act of oral copulation that occurred in May 2006, at the latest, based on evidence that Doe was six years old during the incident; and

---

[*] See footnote, *ante*, page 1.

5.

(2) an act of digital penetration that took place when Doe was 10 years old, that is, sometime between May 2009 and May 2010.

The jury was instructed that a guilty verdict on count 2 would require unanimity as to which act defendant committed, but there was no instruction that the act must be found to have occurred on or after September 20, 2006, section 288.7's effective date.[4] The prosecutor, in closing argument, identified the age-six oral copulation and the age-10 digital penetration as the two acts that could support conviction on count 2 and reminded the jury that it could rely on either one, or both, so long as all jurors agreed on which act(s) occurred.

While the jury returned a guilty verdict on count 2, the verdict form did not contain any field to indicate which act or acts the jury used as the basis for this verdict, or when the act(s) occurred. "Since the jury was not asked to make a finding that [c]ount 2 occurred after the effective date of section 288.7, its verdict 'cannot be deemed sufficient to establish the date of the offense[] unless the evidence leaves no reasonable doubt' that the conviction was based on an incident that occurred on or after September 20, 2006." (*Rojas*, *supra*, 237 Cal.App.4th at p. 1306.) Here, we cannot be sure the jury did not rest its verdict exclusively on the age-six incident that could not have occurred any later than May 2006—several months before section 288.7 became effective.

Because we cannot conclude beyond a reasonable doubt that defendant was found guilty based only on conduct that occurred on or after September 20, 2006, we agree with the parties that we must reverse the conviction on count 2. (See *Rojas*, *supra*, 237 Cal.App.4th at p. 1306 ["any application of section 288.7 to conduct that occurred prior to September 20, 2006, is a violation of the state and federal ex post facto clauses"].) We

---

[4] Neither party requested such an instruction, and defendant did not raise an ex post facto challenge below. However, an ex post facto violation resulting in an unauthorized sentence can be raised on appeal even where the defendant failed to object below. (See *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.)

remand for possible retrial on this count because the prosecution presented evidence from which a jury *could* conclude that the offense was committed on or after September 20, 2006—namely, the evidence pertaining to the age-10 digital penetration somewhere between May 2009 and May 2010.

## II.    CSAAS STATISTICAL EVIDENCE

Defendant challenges Love's expert testimony regarding the two sets of CSAAS statistics outlined above.  Although it is not entirely clear from the headings in the opening brief, we understand defendant to be arguing primarily that the trial court erred in admitting this portion of the expert testimony, despite defense counsel's failure to object to it; and secondarily that, if we find that claim forfeited, we should nevertheless reverse based on ineffective assistance of counsel for failure to object.  The People do not request forfeiture as a penalty, and we opt to address the claim of error on the merits, as doing so effectively allows us to dispose of both arguments at once—given that we discern nothing objectionable about the statistics testimony at issue.

### A.  Relevant Law

We review for abuse of discretion decisions regarding the admissibility of expert testimony.  (*People v. Brooks* (2017) 3 Cal.5th 1, 43.)  Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in "evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 (*Bowker*).)  CSAAS testimony is permitted " 'to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,' " such as delayed disclosure of the abuse.  (*McAlpin*, at p. 1301; see *Lapenias*, at p. 172.)  An expert's explanation of CSAAS "is admissible to rehabilitate [a complaining] witness's credibility when the

7.

defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, at p. 1300.)[5]

However, pursuit of that laudable rehabilitative purpose must not lead the expert to cross over into affirmatively vouching for the truthfulness of a complainant's allegations against the defendant. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [identifying the problem of the expert " 'vouching for the veracity' " of the alleged victims]; *People v. Munch*, *supra*, 52 Cal.App.5th at p. 468 [" 'The expert is not allowed to give an opinion on whether a witness is telling the truth . . . .' "].) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) Accordingly, a CSAAS expert also "may not give ' "general" testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused.' " (*People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).) Overall, the testimony must respect the " ' "fine but essential" ' " line between an " ' "opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning [the] defendant's legal guilt." ' " (*Id.* at p. 887.)

Thus, the Courts of Appeal have repeatedly held it to be an abuse of discretion to permit a CSAAS expert to testify—either qualitatively, or with specific statistics or percentages—to the infrequency with which children make false allegations of sexual abuse. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 179 [error to admit expert testimony that it was " 'rare' for children to make false allegations of sexual abuse"]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, 570–571 (*Wilson*) [expert testimony about studies finding false allegations in 1-to-6 percent of cases had the impermissible "effect

---

[5] Despite continuing advancement in the understanding of how children commonly react to sexual abuse, CSAAS evidence remains "a valid and necessary component of the prosecution case in matters involving child abuse." (*People v. Munch* (2020) 52 Cal.App.5th 464, 466; see *ibid*. [holding that the Supreme Court's reasoning in *McAlpin* "is as valid today as it was in 1991"].)

of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth"]; see also *Julian, supra*, 34 Cal.App.5th at pp. 883–884, 886 [same false allegation statistics were not admissible because they "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case"].) As the *Wilson* court put it, the jury must be left to evaluate a complaining witness's testimony, together with all the other evidence, "without statistical evidence placing a thumb on the scale for guilt." (*Wilson*, at p. 571.)

## B. Analysis

### 1. *No Abuse of Discretion*

Against this backdrop, defendant argues that "[t]he CSAAS expert's testimony included statistical evidence that served only to bolster [Doe]'s credibility." He takes issue with the two sets of statistics briefly discussed by Love. First, defendant contends that "Love engaged in impermissible witness vouching through his testimony that 94% of abusers were uncles or others who had a pre-existing relationship with an abused child." Second, he objects to Love's testimony that delayed disclosure was more the rule than the exception based on studies showing that 74 percent of sexually abused children had not disclosed 12 months after the molestation, 50 percent had not disclosed five years later, and another group averaged 10 to 15 years before disclosing. According to defendant, this "statistical evidence regarding delayed disclosure amounted to impermissible witness vouching because it permitted the jury to attribute [Doe]'s delay in reporting to a numerical likelihood without assessing the particular circumstances of the case and her credibility."

We reject defendant's arguments because these are not the sort of statistics that " ' "convey[] a conclusion concerning defendant's legal guilt." ' " (*Julian, supra*, 34 Cal.App.5th at p. 887.) Unlike in *Lapenias*, *Wilson*, and *Julian*, the CSAAS expert here gave no testimony about how frequently or infrequently people make *false*

9.

*allegations* of childhood sexual abuse. Rather, the challenged statistics were regarding (1) how often abused children have a preexisting relationship with their abuser, and (2) how often abused children delay reporting sexual abuse. These statistics could help the jury assess Doe's credibility in the sense that, if a juror believed Love, they would be less inclined to *disbelieve* Doe simply because she had a familial relationship with defendant and did not tell anyone of the alleged abuse for many years. These are not statistics that improperly bear on the specific complainant's veracity, as false allegation statistics necessarily do. They are not statistics that "plac[e] a thumb on the scale *for guilt*." (*Wilson*, *supra*, 33 Cal.App.5th at p. 571, italics added.) Rather, by attempting to dispel two common myths and misconceptions—that abusers are usually strangers to the victim and that victims usually come forward right away—they help the jury objectively "evaluat[e] the credibility of an alleged child victim of sexual abuse." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 171; see *McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.) This is precisely what CSAAS testimony is meant to do.

The problem in *Wilson* and *Julian* was not that the CSAAS expert used statistics in his testimony but that he used statistics *conveying that complainants almost always tell the truth*—and therefore that the defendant was most likely guilty. (See *Wilson*, *supra*, 33 Cal.App.5th at p. 570 ["the practical result" of the false allegation statistics "was to suggest to the jury that there was an overwhelming likelihood [the complainants'] testimony was truthful"]; see also *Julian*, *supra*, 34 Cal.App.5th at p. 886 ["Where expert opinions *on the statistical probability of guilt* are admitted, the jury may be 'distracted' from its 'requisite function of weighing the evidence on the issue of guilt,' and may rely instead on this 'irrelevant' evidence." (italics added)].)

Statistical probabilities are not inherently suspect when it comes to explaining CSAAS.[6] Though appropriately broached with caution given the above case law,

---

[6] As defendant points out, in deferring its ruling on a motion in limine to exclude Love's CSAAS testimony altogether, the trial court indicated Love would not be allowed

CSAAS statistics remain admissible if they merely educate the jury to counter "a specific 'myth' or 'misconception' suggested by the evidence." (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394 [discussing admissibility of CSAAS evidence in general].) Notably, statistics about false allegations do not relate to a common myth or misconception about children who are sexually abused. Indeed, *Julian* and *Wilson*'s discussion of these statistics specifically distinguish the topic of false allegations as separate from CSAAS. (See *Julian*, *supra*, 34 Cal.App.5th at p. 883 ["After presenting CSAAS evidence, the People introduced a new issue—the statistical percentage of false allegations by child sexual abuse victims."]; *Wilson*, *supra*, 33 Cal.App.5th at p. 568 [quoting the prosecutor's statement to the CSAAS expert: " 'I want to step outside of the accommodation syndrome briefly and talk to you about . . . false allegations.' "].)

By contrast, the statistics challenged here were targeted to address certain myths or misconceptions about childhood sexual abuse. Love shared the 94-percent-known-abuser statistic in the course of explaining why "it's not the truth" that the danger comes from strangers or "the dirty old man with jelly beans." *McAlpin* itself held permissible CSAAS testimony that was proposed to cover, among other things, studies reporting "that *in most cases* the child molester is not in fact a stranger to his victim." (*McAlpin*, *supra*, 53 Cal.3d at p. 1303, italics added; see *id.* at pp. 1303-1304 [because the jury already knew that the defendant was not a stranger to the victim, "[s]uch testimony would . . . 'assist the trier of fact' (Evid. Code, § 801, subd. (a)) by giving the jurors information they needed to objectively evaluate the People's evidence"].)

And, contrary to defendant's view, Love's inclusion of "uncles" among the various sorts of non-strangers who make up the 94-percent statistic also did not invite the

---

to "get[] into any numerical evaluation or percentages of children who report or don't report or do so lately." For the reasons discussed herein, this expressed an overly conservative view of the permissible scope of CSAAS testimony to the extent it disapproved the use of statistics reflecting rates of delayed reporting.

jury to infer guilt based on probability alone. As the People point out, Love gave a veritable "laundry list" of types of people who might be among the 94 percent of abusers who have an extant relationship with the child they abuse, listing uncles alongside "brothers, . . . moms, dads, sisters, priests, rabbi, Boy Scout leader, teachers," and counselors. It would be illogical for a juror to apply this testimony to conclude that simply because defendant is Doe's uncle and was not a stranger to her when the alleged abuse began, he most likely sexually abused her. Further, defendant's argument that this testimony constituted "affirmative profile evidence" borders on the frivolous. Love testified that 94 percent of abusers have some prior relationship with the victim—not that 94 percent of abusers are their victim's uncle. The category of people "who have an existing relationship with the victim" is a category so broad and nebulous that it cannot be construed as a "profile" that would lead a jury to convict just because defendant falls within it.

In sum, there was no error in admitting Love's CSAAS statistical testimony about the prevalence of preexisting relationships between abuser and abused because the testimony targeted a common misconception regarding child sexual abuse. That CSAAS statistic thus served the permissible purpose of helping the jury evaluate Doe's credibility, free of preconceived misconceptions, while not relieving jurors of their ultimate duty to independently determine the truthfulness of her testimony.

Love's second set of contested statistics targeted another common misconception regarding child sexual abuse: that victims will not delay in disclosing their experiences of abuse. In discussing the fourth category of CSAAS behavior, Love testified that, contrary to societal misconceptions about delayed disclosure indicating fabrication, the research showed that 74 percent of sexually abused children had not disclosed one year after the molestation, 50 percent had not disclosed five years later, and another group averaged 10 to 15 years before disclosing. Thus, Love opined that "actually it was more

common to delay than not," and that "delay seems to be more part of the ingredient than the exception to the rule."

Defendant argues that this "statistical evidence supporting the notion that delayed disclosure was the norm could only have led the jurors to conclude that [Doe]'s allegations were true." This overstates the testimony's potential. In fact, the testimony was offered to ensure that the jury *did not* conclude that Doe's allegations must be *false* based on adverse assumptions from her multi-year delay in disclosure. A classic permissible use of CSAAS evidence is to "explain the typical behaviors of sexually abused children, such as delayed reporting." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179; see *McAlpin*, *supra*, 53 Cal.3d at p. 1301.) Love simply used numerical statistics to explain how "typical" the behavior of delaying disclosure is. The use of numbers to demonstrate the prevalence of a certain behavior does not change the fact that the testimony was offered to rebut a specific misconception regarding the import of delayed disclosure—a purpose firmly permitted by the CSAAS case law, dating back to its origin. (See *McAlpin*, *supra*, 53 Cal.3d at p. 1300 ["expert testimony on the *common* reactions of child molestation victims . . . is admissible to rehabilitate [the complaining] witness's credibility . . . ." (italics added)].)

A reasonable juror would not draw from this testimony that a delayed disclosure is necessarily a truthful one. And, making doubly sure the jury did not do so, Love emphasized both before and after describing these statistics that CSAAS "is not a clinical diagnostic tool" and cannot be used to diagnose child abuse or "determine the validity" of an allegation. This is because, as he informed the jury, CSAAS "is a collection of behaviors drawn from studying children who were truly molested." The studies, he explained, did not bear on the ultimate judgment of "true or false," as that would be diagnosis. Love summed up the CSAAS studies as simply saying: "if a child delays, don't disregard everything else because there's a delay." The nature of the cited statistics, combined with these repeated surrounding disclaimers, belie any reading of

13.

Love's testimony as impermissibly vouching for the truthfulness of the abuse allegations at hand.[7]

### 2. No Prejudice

Even if defendant could show an abuse of discretion in admitting these statistics, reversal would be unwarranted for their very brief mention amidst myriad instructional safeguards. Applying the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, it is not reasonably probable the case would have come out more favorably for defendant absent the alleged error in admitting the challenged statistics testimony.[8] (See *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "].)

First, Love's discussion of the challenged statistics comprises, in total, only about one page of the 37-page transcript of his testimony. The jury was by no means "bombarded" with the statistics regarding rates of existing relationships and delayed disclosure. (See *Julian*, *supra*, 34 Cal.App.5th at p. 888 ["Such evidence may not be prejudicial where it occurs in a slight passing reference by the expert. But here the jury was bombarded with it."].) Further, the prosecutor did not return to these statistics in her closing argument. She simply reminded the jurors, in general terms, of Love's testimony

---

[7] It is undisputed that Love's testimony could not be seen as literally vouching for Doe's truthfulness, as the jury was repeatedly informed that Love had never met her and had no knowledge of the facts of this case. (See *People v. Munch*, *supra*, 52 Cal.App.5th at p. 475 ["The potential prejudicial impact of [the expert]'s testimony was also reduced because [the expert] testified that he knew no facts about this case."].)

[8] Courts routinely apply *Watson* to determine whether improper CSAAS testimony was prejudicial. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [refusing to apply the standard of *Chapman v. California* (1967) 386 U.S. 18, 23-24]; *Wilson*, *supra*, 33 Cal.App.5th at pp. 571–572 [same]; *Bowker*, *supra*, 203 Cal.App.3d at p. 395.) In *Julian*, which found prejudice by either standard, the court was addressing multiple types of error resulting in an unfair trial. (*Julian*, *supra*, 34 Cal.App.5th at pp. 889–890.)

on the CSAAS patterns of behavior and asked them "not to discredit [Doe's] testimony because she didn't come forward right away."

Finally, the jury twice received a version of the pattern CSAAS limiting instruction that Love's testimony "is not evidence that the Defendant committed any of the crimes charged against him" or any uncharged conduct, and that "[y]ou may consider this evidence only in deciding whether or not [Doe]'s conduct was not inconsistent with conduct of someone who has been molested or in evaluating the believability of her testimony." (See CALCRIM No. 1193.) The court so instructed the jury both immediately before Love testified and again in giving the full instructions after the close of evidence. The jurors also received the standard evidentiary instructions that they were not bound by an expert's opinion (CALCRIM No. 332) and that they were the sole judge of witness credibility (CALCRIM No. 226). "We presume the jurors understood and followed the instructions." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180 [citing these same instructions in support of harmlessness].)

### 3. *No Ineffective Assistance*

For the foregoing reasons, defendant's secondary claim of ineffective assistance of counsel also lacks merit. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [reversal for ineffective assistance requires both deficient performance and prejudice].) Because the statistics did not go toward a likelihood of complainant truthfulness but rather neutralized specific misconceptions of child sexual abuse, there was nothing improper about them; and counsel was not deficient in failing to object to those portions of Love's testimony. Moreover, given that any error was harmless, defendant cannot show he was prejudiced by counsel's purported deficiency. (See *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [*Watson*'s harmless error standard is substantially the same as *Strickland*'s prejudice prong].)

15.

## III.    EXCESSIVE PUNISHMENT[*]

Finally, defendant argues that the imposition of indeterminate terms on counts 2 and 3 resulted in unconstitutionally excessive punishment under both the state and federal Constitutions.  Defendant characterizes his 46-year aggregate sentence as a "de facto sentence of life in prison with no possibility of parole," given that he was 58 years old at the time of sentencing.  Our conclusion that the conviction and sentence on count 2 must be reversed for the ex post facto violation and remanded for possible retrial makes it premature to address defendant's sentencing arguments.  (See *People v. Jensen* (2003) 114 Cal.App.4th 224, 241 ["Because we reverse the judgment and remand for a possible retrial, it would be premature for us to address defendant's claim that the sentence imposed by the trial court was cruel and unusual."].)  Because our partial reversal materially alters defendant's aggregate sentence, we remand the matter to the trial court for full resentencing even if the People elect not to retry count 2.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, . . . 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)[9]  We therefore decline to offer an advisory opinion on the constitutionality of discrete portions of the sentence as it currently stands.  At resentencing (with or without retrial), the trial court should again address the contention in the first instance if defendant reasserts this constitutional challenge to the sentence ultimately imposed.

## DISPOSITION

We reverse defendant's conviction on count 2 and remand this matter to the trial court to afford the People an opportunity to retry count 2.  Regardless of whether the

---

[*] See footnote, *ante*, page 1.

[9] On remand the trial court may not impose an aggregate sentence that exceeds defendant's original aggregate sentence of 46 years to life.  (See *People v. Brown* (1987) 193 Cal.App.3d 957, 961.)

People elect to retry defendant on count 2, the trial court shall conduct a full resentencing in a manner consistent with this opinion.  The judgment of conviction is otherwise affirmed.


                                                                DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


SNAUFFER, J.