Filed 10/22/20  P. v. Gonzalez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSE FRANCISCO GONZALEZ,<br><br>        Defendant and Appellant. | A157110<br><br>(San Francisco City & County<br> Super. Ct. No. SCN228170) |

Defendant Jose Francisco Gonzalez was convicted of numerous acts of sexual abuse of a six-year-old who lived with his family in the second story of the house in which Gonzalez also resided.  He maintains the trial court erred in allowing testimony on the Child Sexual Abuse Accommodation Syndrome (CSAAS) and by instructing the jury on that issue, and that he was prejudiced by the cumulative effect of the claimed errors.  Defendant and the Attorney General agree the abstract of judgment should be corrected because it incorrectly indicates he was sentenced under the "One Strike" law in two counts.

We conclude the trial court did not err in allowing the challenged testimony or in instructing the jury, but that the abstract of judgment should be corrected.  In all other respects, we affirm.

1

## BACKGROUND

In July 2016, L.L., then six years old, lived in the upper floor of a house with his parents and younger brother, J.L., who was almost three years old. That month, defendant moved into a room on the lower floor. Defendant was friends with L.L.'s and J.L.'s mother (Mother), and she regarded him as "a family member." The family trusted defendant, who they called Pancho, and he often babysat the boys.

In mid-March 2017, Mother arrived home from work around 5:00 p.m. She had a migraine headache, so she took a nap while L.L. and J.L. sat on the couch and watched a movie. She was awakened around 9:00 p.m. by the children's yelling. Her husband was not there, but defendant was sitting between the boys on the sofa. Mother was not surprised to see defendant, as he had access to the upper floor because there was no bathroom downstairs. She asked defendant why he had not sent them to bed, and he replied they had been watching a movie.

The following day, Mother picked up the boys from school. After they arrived home, Mother and the boys lay down on her bed; the boys were "[o]n the iPad." J.L. said to Mother, " 'Mom, [L.L.] did something bad.' " Mother asked him what, and J.L. responded " '[L.L.] sucked Pancho's dick.' " J.L. demonstrated by putting his finger in his mouth and sucking it. L.L. told J.L. to " 'Shut up. Shut up. Shut up.' " L.L. was "very nervous and he was very afraid and he was crying a lot."

Mother told L.L. if he did not tell her what had happened, she would have to tell his father. L.L. said he "would tell [her] everything but [she] shouldn't tell his dad or the police because he didn't want his friend to go to jail." He told Mother what J.L. had said "was the truth." L.L. explained "they were watching the movie and that Pancho came up and he was with

2

them and that they were playing. . . . And then [J.L.] pushed [L.L.] and that he fell on top of [defendant's] private parts. And [defendant] said, 'Well, rub me.'" Mother asked "'Is it true what your brother said, that you sucked [defendant's] penis?' And [L.L.] said, 'Yes, Mom. Yes it's true.' And he said, 'I don't like it, Mom. I don't like that, and I don't want to do that.'" L.L. also told Mother "sometimes they were in the bathroom, [defendant] would take his penis out and put it on top of [L.L.'s] head." This happened "a lot of times." He also said defendant had put his finger in L.L's anus, and that it hurt. Both acts happened "a lot of times." L.L. told Mother "[she] shouldn't cry and [she] should just forget it because he also forgets it every time that it happens to him." He said defendant told him what happened "was a secret between him and [defendant], and . . . [¶] … [¶] if he told [Mother] I would cry a lot, and he didn't want to see my crying and suffering."

Mother called her niece J.S., a childcare worker, and said she wanted to come over and speak with her. Mother brought the boys with her. She spoke with J.S. outside the house, while the boys were still in the van. Mother was crying, and said J.L. had "said something that she could hardly believe [¶] …[¶] . . . that L.L. would suck [defendant's] dick."

Mother asked J.S. to talk with the boys. J.S. went inside the van with the boys, while Mother waited outside. She asked each of them about school. J.L. volunteered that "'You know that [L.L.] sucks [defendant's] dick.'" L.L. yelled at J.L. to "'Shut up,'" and "'It's your fault.'" J.S. asked why it was J.L.'s fault, and L.L. explained "'Because we were playing around yesterday. And because of [J.L.] I hit [defendant's] private parts.'" Defendant then told L.L. he "had to rub it." L.L. started to cry and said he did not want defendant to go to jail "'because he's my friend.'" He explained, "'It's just that [defendant] touches me.'" "'He touches my ass.'"

3

The next day, L.L.'s father (Father) asked him "if it was true what had happened about what this man was doing to him, and . . . I told him to tell me the truth, that I didn't want any lies." L.L. told Father defendant "made him suck his dick." L.L. demonstrated by "stick[ing] his finger in his mouth . . . [and] sucking on it." He also told Father that defendant touched "his butt."

The following day, L.L.'s school principal spoke with L.L. in her office at Mother's request to determine if what he had told her about defendant was true. The principal asked him " 'Is somebody bothering you and touching your private parts?' " L.L. said " 'yes' " and "waved around his crotch area." The principal asked " 'what else is he doing to you?' " and L.L. responded " '[h]e puts it on my head, and he makes me kiss it.' " L.L. said he was referring to defendant's penis. The principal asked if defendant did anything else, and L.L. "pointed to his butt" with his index finger. The principal asked how long this had been happening, and L.L. started crying and said a " 'very long time.' " L.L. indicated "Pancho" was the person touching him. As a mandated reporter, the principal called Child Protective Services and the school resource officer, who are specially trained San Francisco Police officers.

An emergency response worker from Child Protective Services met with L.L. in the principal's office. L.L. asked if he was " 'here to protect [him]?' " and he said yes. L.L. told him he lived with Mother, Father, his little brother, "and he also said that Pancho lives in his home as well in the downstairs portion." L.L. described Pancho as " 'muy malo,' " which mean " 'real bad,' " because he " '[t]ouched my private parts.' " L.L. said defendant "had put his finger . . . inside his butt." He also told the emergency response worker that defendant put his penis in L.L.'s mouth. Defendant would tell L.L. in Spanish that " 'I am your love.' " Defendant also told L.L. "not to tell his

4

mom because it would make his mom sad." The emergency response worker drove L.L. to San Francisco General Hospital for a forensic interview.

At a special unit of the hospital, the coordinator of the medical forensic team conducted a videotaped interview of L.L. L.L. said defendant was his "big best friend" who "did a lot of things to me." He said defendant "put my head in his nuts" and told him "never tell my mom" on a "lot of days." L.L. described the incident on the sofa. He said he was jumping on the sofa in his living room, and his brother J.L. "made [him] fall" on defendant's private parts. Defendant "wanted [him] to suck on" his private parts, and put L.L.'s head on his private parts. J.L. was there and saw him "do that to [defendant]," L.L. described another incident where defendant put L.L.'s penis in defendant's mouth. L.L. also said defendant "put his nuts on my butt" and it was "disgusting" and "hurt so much."

J.L. was also interviewed at the hospital. When asked "What does [defendant] do?" he responded "He looks for [L.L.'s] ass." He also said defendant had sucked L.L.'s penis.

A physician conducted a forensic examination of L.L. at San Francisco General Hospital. The exam revealed no findings, which would not be unusual given the allegation that sexual abuse had occurred a day or two before. The physician agreed that " '[m]ost children are not abused in a way to leave permanent physical findings.' "

L.L., who was eight years old at the time of trial, testified defendant was his "big best friend" and often babysat for him. He did not want to say defendant's name, but he spelled out "Pancho." Defendant touched his "pee-pee and butt" with his "hand and mouth." L.L. demonstrated how defendant would put his mouth on L.L.'s penis by sucking a straw. He also demonstrated how defendant would put his hand on L.L.'s penis and move it

5

"backwards." L.L. testified defendant put his mouth on L.L.'s penis more than five times, and put his hand "in my butt" "a hundred" times. Defendant also made L.L. put his mouth on defendant's penis, and touch defendant's butt with his hand. L.L. asked defendant to stop "a bunch of times," but he said no. He did not tell his mother earlier because defendant said "it was a secret." He identified defendant in court as the man who touched his private parts.

A psychologist, Anthony Urquiza, testified as an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). CSAAS explains the experience of being sexually abused using a five-part framework. Those five parts are secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation.

Dr. Urquiza testified "most children are sexually abused by somebody with whom they have some type of ongoing relationship," and the relationship involves an imbalance of power. The imbalance of power is part of the "helplessness" factor, and one reason children "keep quiet" about the abuse. Another is outright threats. He explained an abuser often provides a lot of attention, affection and gifts, which is part of the "grooming" process. The child starts to like that person, and then "sexuality gets introduced." "The idea is this gradual process in which a close relationship is developed, it is made more sexual. And kids get in this awkward sort of situation where they may like this person but not feel comfortable being able to disclose what happened to them." He explained "[i]f there was an effort to befriend, to take some steps to develop a close relationship . . . between that perpetrator and the victim and that was then used as a means to sexually abuse the child, that would be sort of a classic sense of what grooming is about." The

6

imbalance of power also explains the helplessness factor, which is a reason for a child's reluctance to report the sexual abuse.

The third factor is entrapment and accommodation, which involve strategies used to cope with the experience of being abused. Those strategies include suppression or compartmentalization of unpleasant feelings. A child referring to his abuser as his "best friend" is consistent with the accommodation factor.

The fourth factor, delayed and unconvincing disclosure, is a "very common phenomenon." "[I]t's really pretty common for kids to have a significant delay in disclosure from first abuse to when they first disclose."

The final factor in CSAAS is retraction. About 20-25 percent of children who are sexually abused retract the allegation, "usually because they are pressured by a family member."

An expert on false memory and suggestibility of children testified on behalf of defendant. She testified children can make false accusations of sexual abuse. The primary causes of false accusations are deliberate lying, going along with the interviewer who suggests abuse occurred, and false memories. False accusations are more likely to occur in certain situations, such as a custody battle or conflict within a family, and suggestive circumstances. The expert described the phenomenon of "priming," which is "something that gets a particular idea or expectation in your mind." She provided the example of "a policeman trying to catch criminals all day is primed to think about misbehavior." She also testified that over time, memories fade "in clarity and detail and in accuracy." She acknowledged the existence of studies showing a low rate of false allegations of sexual abuse by children in non-custody cases, under ten percent, but criticized them.

7

Dr. Urquiza testified in rebuttal. He testified "kids can be misled to believe that something has occurred in their life when it really hasn't if it tends to be a common characteristic, if it tends to be something that is a typical, common aspect of their life. [¶] … [¶] If it's implausible, it it's something that doesn't usually happen, if it's something that is not a common occurrence in their life, that implantation would be incredibly difficult to do." He testified that false allegations of child sexual abuse are rare, involving only one to six percent of cases.

The jury convicted defendant of two counts of oral copulation or sexual penetration of a child (Pen. Code, § 288.7, subd. (b)), one count of forcible lewd act on a child (*id.,* § 288, subd. (b)(1)), and one count of lewd act on a child. (*Id.,* § 288, subd. (a).) The jury found him not guilty of sexual intercourse or sodomy with a child. (*Id.,* § 288.7, subd. (a).) The trial court sentenced defendant to a total term of 23 years to life.

## DISCUSSION

### *Admission of Expert Testimony Regarding Child Sexual Abuse Accommodation Syndrome*

Defendant claims the court erred in admitting expert testimony on CSAAS, asserting "the facts did not require expert testimony" because "no particular issue was made as to any of the factors involved in CSAAS, such as delayed disclosure." He also maintains the court erred in allowing the CSAAS expert to testify, in rebuttal to defendant's expert, about statistics regarding false allegations of child abuse.

Expert testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) " '[T]he admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant

8

of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." ' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300.) We review the trial court's decision to admit expert testimony for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

"[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident-e.g., a delay in reporting-is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin, supra*, 53 Cal.3d at p. 1300.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id.* at p. 1301.) Indeed, "CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision." (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).)

Defendant urges that "no particular issue was made as to any of the factors involved in CSAAS, such as delayed disclosure." But "[i]t is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.] Admission of

9

evidence such as CSAAS is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal. The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745.)

L.L.'s testimony raised issues of his credibility based on such "paradoxical behavior," including his delay in reporting the abuse, his description of defendant as his "big best friend," and his statements that he did not want defendant to get in trouble. Accordingly, evidence of CSAAS was relevant.

Defendant also asserts "California courts would be well advised to revisit the question of scientific reliability, and this case surely suggests the advisability of excluding this kind of dubious testimony in a close case." He suggest that the role of CSAAS in criminal trial "has come and gone. Jurors now know better." The court in *Munch* recently rejected defendant's contention. In that case, the defendant also claimed: "the trial court erred by admitting expert testimony on CSAAS because it is irrelevant and 'the public no longer holds the presumed misconceptions this testimony purports to address.' " (*Munch, supra*, 52 Cal.App.5th at p. 468.) The defendant in *Munch* also relied on out-of-state cases, as defendant does here, to support his claim. (*Id.* at pp. 468-469.) The *Munch* court rejected that assertion, noting *McAlpin* is "binding on all lower courts in this state." (*Id.* at p. 468.)

Defendant additionally claims the CSAAS expert's testimony about the percentage of false allegations of sexual abuse by children was erroneously admitted, relying on *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*) and *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*).

In *Wilson*, Dr. Urquiza also testified regarding the percentage of false allegations in child sexual abuse cases. (*Wilson, supra*, 33 Cal.App.5th at

pp. 565-566.) The court concluded, "Even assuming one could determine that only 1 to 6 percent of sexual abuse allegations are false, that fact would not be helpful to the jury because it tells the jury nothing about whether this particular allegation is false. . . . The jury must evaluate [the victims'] testimony, together with all the other evidence, to decide this question, and it should do so without statistical evidence placing a thumb on the scale for guilt." (*Id.* at p. 571, italics omitted.) Thus, the court concluded the "statistical evidence was not relevant, and its admission was more prejudicial than probative." (*Ibid.*)

Similarly in *Julian*, the court concluded it was error to admit Dr. Urquiza's testimony regarding statistical evidence of false sexual abuse allegations by children. (*Julian*, *supra*, 34 Cal.App.5th at pp. 883, 886.) "Urquiza's 92 to 99 percent probability evidence invited jurors to presume Julian was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886.)

Unlike in *Wilson* and *Julian,* here Dr. Urquiza's testimony was very brief and admitted only in rebuttal to testimony by defendant's expert regarding the suggestibility of children, false memory, and false reporting of sexual abuse. We need not decide, however, whether Dr. Urquiza's statistical testimony was improper in this case. Even assuming the testimony should have been disallowed, as in *Wilson*, the error was harmless given the overwhelming evidence that defendant committed the crimes with which he was charged. " 'The erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Wilson, supra,* 33 Cal.App.5th at pp. 571–572; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

11

As we have recounted, numerous witnesses testified to L.L.'s disclosures and descriptions of the sexual abuse—L.L.'s mother, Mother's niece, L.L.'s father, L.L.'s school principal, the Child Protective Services emergency response worker, and the coordinator of the San Francisco General Hospital medical forensic team.  L.L. also testified consistently with what he had told all these witnesses two years earlier.  In short, here where "the jurors could assess [the victim's] credibility, other percipient witnesses were called, and the defense offered effective rebuttal expert testimony, we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony."  (*Wilson, supra,* 33 Cal.App.5th at p. 572.)

### Instructing the Jury with CALCRIM No. 1193

Defendant also claims the trial court erred by instructing the jury with CALCRIM No. 1193.

The trial court instructed the jury:  "You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse accommodation syndrome.  Dr. Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that [defendant] committed any of the crimes charged against him.  You may consider this evidence only in deciding whether or not [L.L.'s] conduct was not inconsistent with the conduct of someone who has been molested, and *in evaluating the believability of his testimony.*"  (Italics added.)~

Defendant contends the italicized portion of the last sentence of the instruction "affirmatively invites the jury to apply the expert's testimony case-specifically to evaluate the believability of an alleged victim who testified at trial."

12

In *Munch,* the court pointed out it had rejected this assertion, and it did so again in the case before it. "[W]e rejected these contentions in *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504. . . . There we said, 'The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the expert's] testimony to conclude that [the child's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the expert's] testimony to conclude [the child] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction.' " (*Munch*, *supra*, 52 Cal.App.5th at p. 474, italics omitted.)

We agree with this reasoning, and conclude that in this case, as well, there was no instructional error in this case.[1]

### *Abstract of Judgment*

Defendant maintains, and the Attorney General agrees, that the abstract of judgment incorrectly states defendant was sentenced under California's "One Strike" law in counts 2 and 3, oral copulation or sexual penetration with a child. (Pen. Code, § 288.7, subd. (b).) The One Strike law does not apply to violations of section 288.7 (Pen. Code §667.61, subd. (c)), and neither the sentencing minutes nor the reporter's transcript of

_____

[1] Given our resolution of this issue, we need not, and do not, reach the Attorney General's claim defendant forfeited his claim of instructional error because he failed to request a modification to CALCRIM No. 1193.

13

sentencing indicate the trial court sentenced defendant under the One Strike law for any count.  Accordingly, we order the trial court to issue an amended abstract of judgment.

## DISPOSITION

The matter is remanded to the trial court to issue an amended abstract of judgment indicating defendant was not sentenced on counts 2 and 3 under the One Strike Law.  The court shall then forward a certified copy of the amended copy of the abstract of judgment to the Department of Corrections and Rehabilitation.  In all other aspects, the judgment is affirmed.

_____

Banke, J.

We concur:


_____

Humes, P.J.


_____

Margulies, J.


A157110, People v Gonzalez

15